Our next case is Wichita Firemen's Relief vs. Kansas City Life Insurance, number 173047 and 17-3128. Counsel? Good morning, Your Honors. If it would please the Court, I'd like to reserve three minutes for rebuttal. May it please the Court, Counsel? My name is Toby Krause with Krause LLC. Folsom Seifkin and I have the privilege of representing the Wichita Firemen's Relief Association in this matter today. We believe this case is about KSA 40-256. That's the Kansas bad faith statute. That statute provides, as the Court knows, that the Court shall allow an award of attorney's fees if it's determined that the insurance company has wrongfully failed to pay the benefit at issue here and the statutory trigger language is just cause or excuse. The magistrate judge identified three justifications for denying fees in this case and we believe that that decision contravenes two clear rules of Kansas law. Does it hurt your position at all that the magistrate originally ruled against you on summary judgment, apparently? I mean, do we have to say the magistrate acted in bad faith? You don't, Your Honor, and thank you for bringing that up. To me, that's the most logical decision. It's like, isn't there a question there with the magistrate judge? And that feeds into our first argument as a matter of law. The decision that we're looking at today is focused upon what the insurance company did in 2010. The magistrate judge in, I believe it was 2014, in the case that we brought to this Court, said that exertion does not constitute an accident under Kansas law. We disagreed with that, brought it to this Court. This Court agreed with us, sent it back down to the District Court, saying that the rupture may be an issue. The reason that is not a just cause or excuse and why the magistrate judge erred in this situation is because that argument didn't arise until after this case was filed. What the insurance company relied upon in 2010 is the presence of an economist's degeneration. And you'll have to excuse me. I'm a history major. I hope I pronounced that correctly, but that's how I'll be pronouncing it today. We wouldn't know. Wow, there you go. So the insurance company identified two bases in both the February and June 2010 denial letters. None of them mentioned exertion as an accident. In fact, they both only identified myxonomous degeneration and the surgery to correct the myxonomous degeneration. Focusing, as the magistrate did here for his first justification, upon that 2014 question is an error of law because it imputes the dispute that was present in the underlying litigation for this case with the denial which occurred four years earlier. And the committee was concerned that there was no accident here. Well, so the magistrate judge's finding, that falls into the second point that I wanted to talk about, Your Honor. The magistrate judge made findings of fact in this situation and that the presence of myxonomous degeneration was found during the surgery. However, the accident in this case was the acute rupture of the caudal tendon. And again, that's how I'm pronouncing it today. Acute rupture of the caudal tendon. That was the accident that caused the surgery. And during that surgery, to correct the caudal rupture, Captain Eck died. So the ad hoc committee at the time, we have evidence in this case that they may have considered that. The only evidence that we have of what the ad hoc committee actually did in 2010, or four years prior to the curated testimony, is myxonomous degeneration, surgery to correct myxonomous degeneration. The magistrate judge's findings of fact in this case indicate myxonomous degeneration was known in 2010 by Dr. Lee not to be the cause of the symptoms. Well, you say the cause, but the standard is that it's contributing to the death, right? And why is it the magistrate is wrong to say, no bad faith or lack of a better term, that the disease and the surgery contributed to the death? So I think that's the policy language is directly and contributing. Under Kansas law, that is a phrase that is not termed to be tied to a preexisting condition. The language of the policy in this case says that the cause of the loss in this situation, death, can't be tied to the myxonomous degeneration. That's why the magistrate judge's findings of fact are critical in this case, that the symptoms in this case were innervated by the acute caudal rupture. The symptoms were unrelated to the myxonomous degeneration. So the symptoms led to the surgery, and during the surgery to fix those symptoms of the caudal rupture caused the loss. In addition, this is a guarantee issue policy. Your question is one that I had as I was coming out here yesterday. I'm like, well, you know, what is this? Is this a preexisting condition? Is that a free pass? And the evidence in the testimony, and I could put in a 28-J, the citation for the appendix, is that this is a guarantee issue policy. In other words, the insurance company cannot rely four to six years later upon what is perhaps a preexisting condition in this situation. If you look at the language of the policy, it's tied to the cause of the loss. And in this situation, the magistrate judge expressly found that the loss was caused by the surgery, which was necessitated by the acute caudal rupture, and had nothing to do with the myxonomous degeneration. It may have been that his unknown condition made the caudal rupture more likely, but under Kansas law, I think it's Foster v. Stonebridge, we indicate, and I think in my opening brief I indicated that for over 100 years, Kansas hasn't looked at preexisting conditions as a means in which to withdraw coverage. I'm pausing, Judge McHugh, because it looks like you have a question, but nope, that's fine. All right, so the third. Well, Kansas had inconsistent case law, right? I mean, they had Gillian or Gilliland, and then they had Miller, and they seemed to be at odds. So this is a different case if the insurance company had said, we believe that Gillian and Miller have, you know, were uncertain as to what that, the evidence before the magistrate judge was that nobody bothered to look at it. Nobody told the insurance company, hey, we think that this exertion as an accident is the basis for our decision. Instead, we have a February 26, 2010 letter, and then a June 10, 2010 letter, and the only thing they said was myxonomous degeneration. When at the time they made that statement, they knew as a matter of fact that was incorrect. Different case, if the court were to look at what the insurance company said in this case, under Kansas law, that's not permissible. And, in fact, we believe that's evidence of bad faith. This is a follow-up, and maybe it's just to put a little finer point on it, but you say that the insurance company knew certain facts to be untrue when it denied the claim. Can you specify what those facts were? Yes, Your Honor, hold on. We rely upon what the magistrate judge's findings are at... I believe it's page 11 of the bad faith, what we call the bad faith order, appendix 9271, and that is the list of seven factors, and then if you turn to page 12, the magistrate judge at the top of that page, appendix 9272, says, these are the medical facts found by KCL's medical director, Dr. Lee, and they constitute the circumstances facing the insured at the time of the denial. In other places in the order, the magistrate says, these facts were known by Dr. Lee are the same ones by Captain X doctors. There may be, as footnote 9 indicates, among this ad hoc group, a misapprehension of what the... Okay, counsel, I asked a pretty direct question. Sure. I just want to know, you make an accusation that Kansas City, that the insurance company knew certain facts to be untrue, and rather than the appendix of footnote 9 and all that other stuff, what are the facts that it knew to be untrue? So it knew at the time it made the decision that the cause of the symptoms was the cortal rupture. It knew at the time of the decision that myxonomous degeneration, while perhaps present, was asymptomatic. It knew that the need for surgery was the cortal rupture. It knew that during the surgery to repair the cortal tendineal rupture, the death occurred. Those are the facts in the 1 through 7 that we indicate. And so to say that myxonomous degeneration was the cause of the loss is incorrect. Is that it? That's the fact they knew to be untrue? Yeah. So that's the fact they assert in their denial letters, is that myxonomous degeneration. Okay. Is that it? I'm sorry. The question's very simple. Yeah. You say that they knew certain facts to be untrue, and my question was, what were the facts they knew to be untrue? And I think you are now saying that they knew the preexisting condition was not the cause. They thought it was. Well, I'm going to let you state your position, but I'd just like a direct answer to the question. Yeah, and I apologize for not answering you directly. I'm evidently not catching it. So what we're relying upon is those seven facts that the magistrate judge found on that appendix that I tried to give you. And I just get the feeling I'm not grasping what you're asking, and I apologize for that. Well, I don't have that up on the screen. Maybe I'd understand it better, but I'll look at it. And so we cited it in our brief, but that's our contention, is that the facts that the magistrate judge found are absolutely the right facts. They're inconsistent with what the insurance company told us in February and June of 2010, and the factual findings create the implication. I think I understand your argument, and I do apologize for that. Let me ask you about Exemption 5. Yep. Okay. As I understand the record, the surgery was scheduled to repair Captain X. X. X. Mitral valve, not his chordal tendine. In fact, they didn't find the problem with the chordal tendine until they were in the middle of surgery. That's when they located it, according to the record. So why doesn't Exemption 5 give them a perfectly valid reason for denying coverage here? With respect, Your Honor, I believe the magistrate judge found contrary to that and said that the surgery, and I believe it was fact number six, and I'll quote, the surgery was required to repair the chordal rupture. And that's on the appendix that I gave Judge Mathison. I believe the insurance company in this case is arguing that, if I understand their argument correctly. With record sites. With record. And we have provided record sites to the contrary, including the finding of facts that the magistrate judge, having heard the case, found. And our position is, if the insurance company wanted to challenge those facts, it needed to file a cross-appeal. Well, if it was uncertain, and they might have had a valid claim for denial under Exemption 5, did they have no good faith basis? They didn't because the magistrate judge found Dr. Lee, at the time the decision was made, knew these seven facts. That's why these seven facts are absolutely critical. They knew, at the time the denial was made, the surgery was required to repair the chordal rupture. And even if you look at the chordal rupture, you have a decision from this case, this court, from when it was up before, sending it back on summary judgment because there's a material issue of disputed fact as to whether the rupture of the chordal structures was caused by extreme exertion in fighting the fire and therefore constituted an accidental bodily injury. That says pretty clearly, even after one appeal, we don't know yet whether it was properly denied. That's right. And that's what I was getting at earlier today. That evidence of the is it myxonomous degeneration or not was created in this case. Dr. Lee, when the decision was made, knew it wasn't. Well, that's about it. This one isn't myxonomous degeneration. It's the chordal rupture of the chordal tende that this court found was the disputed issue of facts. Right. That's what we have said, and that's what the magistrate judge found Dr. Lee knew at the time. And so the question of fact that came up in this case came up in this case. It didn't come up before. In June of 2010, that's why we have to look when the decision was made. I'm sorry, I don't have time, but I would stand for any questions afterwards. Thank you, Your Honor. Thank you, counsel. Good morning, Your Honors. Ben Preheim on behalf of Kansas City Life. I do have to take significant exception to everything that was just discussed in the context of what the magistrate judge found. First, I think it's really important. And the piece that is missing in what you just heard was a statement that is made in the judge's decision where they are claiming, WFRA is claiming, that some of this happened after the fact. That the first time you heard about any of this was after the denial and the decision had been made. That is absolutely not true. What the trial court said on page 13 of his decision, and I quote, there were objectively three good faith grounds for the denial. And this, if you hear nothing else, this is the most important part. These are those articulated by KCL in the denial letters on page 13 of his opinion. So the denials, the three grounds that he utilized, were contained directly in the denial letters. And what is being suggested by WFRA is that somehow Kansas City Life should have included everything that could possibly didn't happen, that didn't constitute a bodily injury, in their denial letters. What KCL did is exactly what it's supposed to do. It said in its denial letters that there was, one, no bodily, accidental bodily injury. It said, two, that it was not independently of all other causes given Mr. X's chronic heart condition. And it said, three, there was an exclusion for injury and death caused by surgery. Every single one of those reasons was included in Kansas City Life's denial letters, every one of them. It was not limiting itself to someone's degeneration. It didn't cite that as the only reason. In fact, if you look at the denial letters, what they say is, and I'll just look at one of them, the June 10 letter on after the appeal, Mr. X's death did not result directly and independently from accidental bodily injury. In fact, at least two other factors contributed to his death, precluding the payment of the ADB benefit. And then they go on to talk about the surgery and an exomenous degeneration and the chronic conditions that Mr. X suffered from. So, when Judge Gale looked at these six or seven facts that they are contending somehow dictates a finding in their favor, that's completely wrong. If you look at page 11 of the judge's decision, what he says is, at the time that the decision was made, and he calls them facts, it's really more what Kansas City Life was told and knew at the time. First, that X had a pre-existing condition, an exomenous degeneration, and that it made him vulnerable to the risk of cardiac rupture. Two, that it was progressive and he'd had it for a long time. Three, that it had caused him no symptoms and did not require surgical intervention. Four, that he suffered an acute rupture of the tendinitis caused by exertion while filing a fire, and that his symptoms were caused by that rupture, and that surgery was required. All of those things are absolutely true, but that doesn't mean that the exomenous degeneration didn't contribute or cause the need for repair of the choroid tendinitis. It also doesn't mean, contrary to what they say, that the only reason for surgery was to fix the choroid tendinitis. Because the fact of the matter is, at the time of the surgery, they fixed the mitral valve with an annulus placement. So they're trying to contend that these facts eliminate the possibility of any claim that there was an accidental bodily injury. Counsel, I'm interested in the relationship of the three grounds you mentioned that are in the court's opinion. And my first question has to do with the first ground, coverage required in an accidental bodily injury, and there's some discussion of that. And then flipping over to the third ground, which has to do with the exemption, the surgery, and that sort of thing. Isn't there some overlap between those two grounds insofar as the argument between the two sides about accidental injury? In other words, if the surgery is performed due to an accidental injury, then complications from the surgery wouldn't be a basis to deny coverage, would it? Right. So it just seems to me those two grounds are linked. Right. Let's talk about the connection. If you look at the Foster case, it's Foster v. Stonehenge. I never referred to Stonebridge. If you look at that case, it talks about the interrelationship between whether the disease is dormant or whether it's active and whether it was contributed to or caused to become active by the accident, if there was an accident. All of that information is interrelated. But what I want to point out is that on the first question that you asked, on the first issue, whether there's accidental bodily injury, every one of those facts that WFRA wants to rely on is exactly what this court dealt with on the first appeal and what this court said. And I'll just quote it. Quite simply, on this record, genuine issues of material fact exist as to whether the rupture of the cortical structures within Mr. Heck's heart, brought on by extreme exertion and fighting a fire, constituted accidental bodily injury. You sent it back. You told us the jury has to decide whether this is accidental bodily injury. Under these very facts that WFRA is now claiming, made it a foregone conclusion that this should have been in place. In fact, your decision in this matter earlier made the assumption, for purposes of this entire dispute, that what WFRA said is true, which is that it was exertion that caused the problem, the tendons ruptured, and so on. So, based on that assumption, this court held, we have to have a jury decide whether there was an accidental bodily injury. That's why we went back, and that's why we had a jury trial. Now, ultimately, it is certainly true that the jury found in favor of WFRA. But, as you well know from the case law, if there's a good faith dispute, the loss doesn't dictate whether fees are awardable. This isn't a winner-take-all fee statute. If Kansas City Life had a reasonable basis for denying coverage, one, because there was no accident. I mean, what was the accident in this case? Ultimately, this court started talking about internal forces that may have contributed to, you know, how much exertion is enough, how much is not enough. I made it, I probably made too much light of it the last time I was here, but, you know, this is more exertion than I'm typically used to in an average day. Is that enough exertion, enough bodily change in me, that if I had something happen and I suffered? This means we're not asking enough tough questions. Well, you can make it worse. But that's the issue. And so what are the internal forces? A jury had to decide that. Was there something that was truly an accident? And the court cited those things. If, I suspect that in rendering the last opinion in this case, the court had some, whether it's an accident is a tough question in this case. It's not like the Stonebridge case that I talked about earlier, where a lady broke her hip. Or the Gilliland case, which this court called the Seminole case, where a guy's swinging a sledgehammer and busting up stones. It's a case where there wasn't anything happen to the guy. He didn't have a ball on him, the floor didn't collapse. He was just doing his ordinary job as a firefighter. It might have been exertion. It might have been stressful. But nothing of an external character happened to him. So what was the accident? And it's a tough question. That's why it went back to the jury. Could I ask just a couple of other things about your brief? You seem to address, again, back to the three grounds that the court talked about. You seem to address the first and second of those in one section in your brief, pages 28 to 36. You didn't break that down. Do you view those two grounds as being two sides of the same coin? No. I was just curious why it was presented that way. You know, I believe they should have been separated. And I believe that as I was reading and preparing for this. Reason two that the judge gave was directly and independently of all other causes. Well, okay. You've answered my question on that score. Slightly different one. Wichita Firemen's argues that the ad hoc committee's consideration of this claim, sort of a procedural complaint, that not enough legal research and analysis and factual investigation. It just wasn't done in the way it should have been done. And I didn't see that addressed in your brief. Do you want to comment on that? I absolutely do. So they put a spin on it that's unfair and inaccurate. But what happened here was Kansas City Life didn't let the senior claims examiner even determine the claim, as you ordinarily would. What they did is they got a panel of five people, most of whom were executive VPs at Kansas City Life, to analyze this very claim because it is such a difficult issue. Was there an accidental bodily injury? Was some of this degeneration a contributing cause? All of the things that they ultimately relied on to deny coverage were determined by a group of people who had decades of experience doing this work. And, as Judge Gale pointed out, the facts never got any better as they investigated the claim further. The facts that WFRA is advancing now as being what the decision should have been made on and what the decision actually was made on only got worse as our investigation continued. In fact, we hired an expert from Temple University who teaches physicians. He teaches at the medical school there and is an expert on this very topic, publishes all over the place. And he came in and actually testified at the trial that this could not have been an acute rupture of those chordae tendineae, that their tear happens gradually over time, and that there's no literature, there's no medical study that supports the concept that exertion did the trick. But that was at trial. That was at trial. That wasn't at the time they were making their decision. That's right. And that's why we're not arguing about it here. I'm just pointing out that investigation didn't help them. The best facts were the facts they had on that day when they have letters from the physicians for Mr. Eck that basically said they believed it was caused by the fighting. And that the myxomatous degeneration was a contributing factor. They didn't even admit that, but that they think the chords were torn during the fight. If you don't stand by the mic, the recorder doesn't pick up your voice, and then we can't hear you when we listen to it. Your Honor, I'm sorry. I was afraid I was getting to be a little bit of a loud talker. I think at the end of the day, since I only have two minutes left, I have to credit Judge Gale, because I think he said what I'm trying to say better than I can say it at the end of his decision. And I'm just going to read what he wrote. The insurer was faced with a factually and medically unusual case which required a non-routine interpretation of the policy. The facts presented to and found by KCL were consistent with the medical records and would not have been improved through additional investigation. The law was unclear with cases providing competing standards. I'm going to break away from this for a minute. The Miller case versus the other cases that you've described, Judge McHugh. But even as understood through the clarified hindsight of the legal history of this case, the application of that law and the policy language to the facts of this case did not dictate a clear single result. Viewed objectively under the circumstances facing KCL at the time of the denial, the evidence does not support a finding of bad faith. When an insurance company has a legitimate basis where there's a pre-existing condition, KCL never argued that a pre-existing condition provision precluded this claim. What KCL said was that there were other contributing factors under the language of the policy that contributed to the loss. And that's what the policy language says. And that there was no accident. So an insurance company, it's not a winner-take-all. It's got to be able to litigate a reasonable, fair, good-faith dispute without being exposed to attorney's fees. And from day one, which we haven't even talked about the cost motion and the offer of judgment, but from day one, this case wasn't about the underlying policy limits. That issue was resolved long ago. We offered up the policy limits early on, six years ago. It's always been driven by this fee claim. And Kansas City Life had a good-faith basis for denying coverage. Ultimately, the jury found that there was an accidental bodily injury, but they had good faith. Thank you, Counsel. Thank you. Does he have any more time? Do you want to say one sentence? Sometimes these one sentences, if you don't take a breath, take a long time. Thank you, Your Honor, for your time. We would just focus on timing. Timing is critical in this case. 2010 is the framework we want to look at. So thank you. All right. Thank you, Counsel. We appreciate your arguments. The case will be submitted and Counsel are excused.